IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 380 HEALTH & WELFARE TRUST FUND, PENSION FUND, ANNUITY FUND AND ADMINISTRATIVE FUND,<br><br>                      Plaintiffs,<br><br>  v.<br><br>STATE ELECTRIC,<br><br>                      Defendant. | Civil Action<br><br>No. 04-2610 |

**OPINION**

Pollak, J.

      The plaintiffs in this action are third-party beneficiary funds ("the Funds") of a collective bargaining agreement ("CBA" or "the Agreement") between Penn-Del-Jersey Chapter, National Electrical Contractors Association ("NECA") and International Brotherhood of Electrical Workers, Local Union No. 380 ("Local 380"). The Funds contend that, from February to December of 2004, defendant State Electric ("State"), an electrical contractor and signatory to the CBA, failed to make all of the contributions required by the Agreement. Pursuant to Section 502 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), the Funds are seeking recovery at an amount totaling $284, 251.59. Currently before the court is their motion for summary judgment against

1

State.

For the reasons set forth below, plaintiffs' motion will be granted in part and denied in part. The Funds are entitled to summary judgment with respect to whether State was obligated to contribute to the Funds at the contractual rates for all hours worked by members of Local 380 during 2004. But summary judgment is not appropriate with respect to the damages sought.

## I. Background

On July 18, 2002, State joined NECA, and signed a letter of assent to the terms of the CBA. Under the Agreement, signatory employers are required to make contributions at set rates for each hour worked by a participant in the Funds. Each employer is also required to submit a payroll report ("Monthly Report"), due not later than the 15th day of each month, setting forth the gross earnings of all covered employees and calculating the contributions due to the various funds. Starting with its Monthly Report for February 2004, State stopped making the full contributions required under the CBA.[1] Then, starting in September, it stopped submitting Monthly Reports and paying into the Funds altogether.

State does not dispute that it failed to make all the contributions required by the Agreement during the period in question. Nonetheless, it denies liability for the $284,251.59 on numerous grounds. First, State maintains that it withdrew from the Agreement in a letter from its attorney to Local 380 dated March 30, 2004, thus terminating its obligations to the Funds either on that date, or on September 5, 2004, when the Agreement was set to expire. Second, State argues that, with respect to the Great Valley job (one of the jobs on which it used labor from Local 380 after the

---

[1] The Funds also assert that, even before 2004, State was consistently late with its contributions, and, in 2003, underpaid by a total of $1,673.12. No events prior to 2004, however, are the subject of this action.

CBA's September expiration date) it was not obligated to make any contributions beyond what it made because of an oral modification of its contract with Local 380. Finally, State contends that, even if it was required to contribute to the Funds for the full period running from February 2004 to December 2004, the Funds' figure of $284, 251.59 does not accurately reflect what its obligations would be because it was arrived at through a flawed methodology.

## II.  Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law ." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where there are facts affecting the outcome of the case which are such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, the court must view all facts and make all inferences in the light most favorable to the non-moving party. *Id.* at 255.

## III.  Discussion

### A.  State's Withdrawal from the CBA

State argues that it terminated its obligations to the Funds when it sent a letter to Local 380 on March 30, 2004 withdrawing from the Agreement. The Funds acknowledge that Local 380 received State's notice of withdrawal. But they deny that the letter cancelled State's obligations to contribute to the Funds, arguing: (1) that, even if valid, the withdrawal would not have taken effect until the Agreement expired on September 5, 2004; (2) that the withdrawal was not valid because State failed to give written notice to NECA that it was revoking its bargaining authority; (3) that, regardless of whether it was valid initially, the withdrawal was effectively rescinded by State's use of labor from Local 380 after the September 5 termination date; and (4) that, at any rate, ERISA bars

3

State from invoking the Agreement's termination as a defense against employee benefit funds seeking to recover contributions.

**1. Date That Withdrawal Could Have Become Effective**

The Funds contend that, by the clear terms of the Agreement, State's withdrawal could not have taken effect until September 5, 2004. This contention is supported by the language of the contract. Article I, Section 1.01 of the Agreement reads in part: "This agreement shall take effect September 3, 2001 and shall remain in effect until September 5, 2004, unless specifically provided for herein." Pl.'s Ex. B. State has not pointed to any language in the Agreement which would suggest that it had a right to terminate its participation prior to September 5, 2004.[2] In its March 30 letter purporting to withdraw from the CBA, State did write: "State does hereby withdraw its membership in, and revokes and withdraws all bargaining rights assigned to, the NECA." Pl.'s Ex. F. That implies that its withdrawal was meant to take effect immediately. However, the letter cites no contractual language authorizing it to do so, and State appears to have subsequently conceded this point, as its reply brief lists September 5, 2004 as the date on which its participation in the CBA ended. Def.'s Opp'n Br. at 2, 6. Thus, based on the undisputed facts, State's withdrawal, even if otherwise valid, would not have been effective until after September 5, 2004. State was therefore clearly liable for contributions to the Funds at least until that date.

**2. Effectiveness of State's Withdrawal**

The Funds argue that State's obligations to make contributions continued even after the September 5 termination date because the March 30 letter, on its own, was not enough to terminate State's participation in the CBA. The Agreement contains a so-called "evergreen clause," according

---

[2] Neither party has produced the full text of the Agreement for this court.

to which it automatically renews on a year-to-year basis unless one of the parties withdraws in the agreed-upon manner. State's letter did comply with the termination procedures laid out in the Agreement itself, according to which "an Employer . . . desiring to . . . terminate th[e] Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement [i.e., September 5, 2004] or any anniversary date occurring thereafter." Pl.'s Ex. B. However, the letter appears insufficient to effect termination under the terms of the document entitled "Letter of Assent-A," which State signed in entering the Agreement in July 2002. According to the "Letter of Assent-A," NECA retains its status as State's collective bargaining representative "until terminated by the undersigned employer [State] giving written notice to the Penn-Del-Jersey Chapter, N.E.C.A. and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement." Pl.'s Ex. D. Jeffrey P. Scarpello, NECA's Executive Director, states in his affidavit that no such notice was ever sent to NECA. Pl.'s Ex. G. In its reply brief, State does not appear to contest Scarpello's assertion that notice of termination was never given directly to NECA. Rather, State notes that, in the March 30 letter sent to Local 380, it specifically withdrew "all bargaining rights assigned to NECA." Def.'s Opp'n Br. at 6 (quoting Pl.'s Ex. F). The question is whether merely including that language in a letter to Local 380 was sufficient to terminate the Agreement.

It would appear that it was not. The "Letter of Assent-A" is the standard form that the International Brotherhood of Electrical Workers uses to cover employers' delegation of bargaining rights. *Local 257, Int'l Bhd. of Elec. Workers v. Grimm*, 786 F.2d 342, 344 (8th Cir. 1986). In *Grimm*, the Eighth Circuit interpreted that form's termination procedures, concluding that "fulfilling the termination procedure set out in the Letter of Assent-A" requires "written notice by the employer

5

to" both NECA and the union. *Id.* at 346.[3] This court agrees with that reading. Moreover, as a general matter, courts consistently hold that terminating a contract containing an evergreen clause requires strict compliance with all of the relevant termination procedures. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Trucks Serv. Inc.*, 870 F.2d 1148, 1156 (7th Cir. 1989) (en banc) (concluding that, to terminate a collective bargaining agreement with an evergreen clause, all the agreement's specifications for termination must be complied with); *Residential Reroofers Local 30-B Health and Welfare Fund v. A & B Metal & Roofing, Inc.*, 976 F. Supp. 341, 347 (E.D. Pa 1997) ("Having failed to comply with the explicit requirements set forth in the CBA, Defendant's efforts to terminate the agreement were ineffective."). Thus, State's failure to send written notice of termination to both Local 380 and NECA means that its 2004 termination of the agreement was ineffective.

### 3. Validity of Termination of Defense

The Funds argue in the alternative that, even if there remains some dispute about whether State did effectively withdraw from the CBA, State is nonetheless barred by Section 515 of ERISA from invoking the Agreement's termination as a defense against having to make contributions beyond September 5. 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan . . . under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of . . . such agreement."). The Funds are a third-party beneficiary of an agreement between State and Local 380. As a general matter, "[t]hird-party beneficiaries are . . . subject to the same defenses that

---

[3] In *Grimm*, the employer's attempt to terminate its participation to the CBA was held ineffective both because written notice was never provided to the bargaining agent, NECA, and because it was untimely. 786 F.2d at 346. Here, only the first problem exists.

the promisor [i.e., State] could raise in a suit by the promisee [i.e., Local 380]." *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1102 (3d Cir. 1996). However, Section 515 limits the defenses that a employer can invoke against a third-party beneficiary to a collective bargaining agreement. *Id.* The general purpose of Section 515 is to "ensure that benefit plans must pay out to beneficiaries whether or not employers live up to their obligations." *Id.* at 1103; *see also Gerber Trucks*, 870 F.2d at 1153-56 (describing the history and purpose of Section 515). Accordingly, the Third Circuit recognizes only three defenses that an employer may assert against employee benefit funds seeking to recover contributions: (1) that the fund contributions themselves are illegal; (2) that the collective bargaining agreement is void *ab initio;* and (3) that the employees have decertified the union as its bargaining representative. *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992).

With respect to the defense of termination, the only possible *Starlite* defense is the second one – that the collective bargaining agreement is void *ab initio*. "The defense of termination, though, is one of voidability of the contract, not that the contract is void *ab initio*." *A & B Metal & Roofing*, 976 F. Supp. at 347; *see also Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993) (holding that, because an employer's claim that it terminated the CBA does not involve the contention that "the CBA never existed because of fraud or illegality," such a claim amounts to asserting that the CBA is "voidable," not that it is "void"). Thus, so long as there is a dispute between State and Local 380 over whether the Agreement was terminated, State is barred from raising termination as a defense against the Funds. *See Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*, No. 02 C 1809, 2004 U.S. Dist. LEXIS 23558, at *52 (N.D. Ill. Nov. 17, 2004) ("The . . . termination defense is only available if the termination of the

agreements is incontestable from the face of the agreement. Where, as here, the contract is either unclear or termination is disputed, § 515 of ERISA bars consideration of the contract termination defense."); *see also Bla-Delco Construction*, 8 F.3d at 1369 (holding that an employer must effectively litigate the issue of termination with the union before it can raise it as a defense against a third-party beneficiary of the CBA). Therefore, even if there is a genuine dispute as to whether State effectively terminated the Agreement, the Funds are still entitled to summary judgment with respect to whether State's purported termination affected its obligations to the Funds; the mere fact that the termination is in dispute means that State cannot raise it as a defense against the Funds.[4]

**B. Oral Modification of the Agreement**

State contends that, because of an oral modification of its contract with Local 380, it was not obligated to make any contributions to the Funds on the Great Valley job beyond August.[5] State was

---

[4] The Funds make one additional argument for why State was obligated to make contributions throughout all of 2004 despite its purported withdrawal from the CBA. They assert that, even if State's March 30 letter did effectively terminate the Agreement, its continued use of Local 380's employees after the September 5 expiration date essentially reinstated it. In support of this proposition, they cite the "course of conduct" theory of contract acceptance as applied to collective bargaining agreements, according to which an employer's conduct can render it liable for benefit contributions even in the absence of its written agreement to the terms of the CBA. *See A & B Metal & Roofing*, 976 F. Supp. at 344-45 (discussing the "course of conduct" theory in this context). However, in the cases in which courts have used this theory to hold an employer bound by the terms of a CBA simply based on its conduct, the specific course of conduct which was taken to have that binding effect consisted of making benefit contributions in accordance with the CBA's terms. *See Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988); *Trs. of Atlanta Iron Workers, Local 387 Pension Fund v. So. Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir. 1983); *Composition Roofers Union Local No. 30 Welfare Trust Fund v. L.A. Kennedy Inc.*, No. Civ. A. 93-1558, 1996 WL 220975, at *1-2 (E.D. Pa. May 2, 1996). Here, it is precisely because State stopped making the contributions required under the terms of the CBA that the Funds brought this action. Thus, the Funds cannot use a "course of conduct" theory to establish that State continued to be bound by the terms of the CBA after its September 5 expiration.

[5] State's reply brief does not make clear whether it is conceding that, but for this oral modification, it would have been obligated to make contributions to the Funds on the Bock job

a subcontractor on Great Valley to Ernest Bock & Sons, Inc. ("Bock"). Beginning September 1, 2004, Bock stopped paying State for the job. In November, State's President, Sharon Ponticello, met with Ken MacDougall, Local 380's Business Manager and Trustee of the Union Benefit Funds, to discuss whether to continue working on the project. According to Ponticello, MacDougall, who had a prior relationship with Bock, informed her that "he would take care of it," which she took to mean that he would seek payment for Local 380 directly from Bock in exchange for State's promise not to pull Local 380 members from the job. Def.'s Opp'n Br. at 5; Def.'s Ex. E. This, State argues, constituted an oral modification of the contract between State and Local 380. In response, the Funds argue: (1) that the conversation did not take place as Ponticello characterizes it; (2) that, even if it did, MacDougall, as one of six Trustees, did not possess the authority unilaterally to modify a union contract; and (3) that, regardless, such a modification would not have been valid as against the Funds under ERISA.

Because State is the non-moving party, it is necessary to assume, for the purposes of this analysis, that the conversation did in fact take place as Ponticello describes it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, I will assume that MacDougall did have the authority, acting alone, to modify the contract.[6] Once those assumptions are made, then the question

---

past the September expiration date, or whether it is merely arguing that, even if its termination was ineffective, it is still not obligated to make these specific contributions because of the modification. Since I conclude that State's purported withdrawal from the agreement did not affect its obligations to the Funds, the analysis is unaffected either way.

[6] It is not entirely clear whether this fact is in dispute. On the one hand, the Funds have not provided the court with any official documents describing Local 380's decision-making procedures. The only evidence they cite in support of their contention that MacDougall lacked this authority is MacDougall's own affidavit. Pl.'s Ex. C. On the other had, State's reply brief does not directly dispute the Funds' contention. At any rate, this fact turns out not to be material. So there is no need to determine whether or not it is in dispute.

before the court becomes whether, under ERISA, State is allowed to invoke an oral modification to the CBA as a basis for avoiding funding obligations clearly written into the Agreement. If not, then, even if the facts are exactly as State relates them, its obligations to the Funds would not be changed.

**1. Oral Modification as a Defense**

The Third Circuit has held more than once that an oral promise to disregard the text of a collective bargaining agreement cannot be enforced against its third-party beneficiary. *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 490 (3d Cir. 1994); *Starlite Hotel*, 977 F.2d at 1505. State argues, however, that these cases are not directly on point because each concerned an oral promise, made during negotiations, not to enforce the agreement as written. In this action, on the other hand, State is not making a defense having to do with the formation of the Agreement. Rather, it is claiming that, because of an alleged oral modification, it is relieved from making contributions it was originally obligated to make. State argues, therefore, that while Section 515 may bar an employer from citing an oral understanding that *preceded* the CBA as a basis for avoiding obligations to beneficiary funds clearly laid out in the agreement, it does not similarly bar an employer from citing a *subsequent* oral understanding as a basis for avoiding such obligations.

Given the goals of ERISA, it is not clear that prior and subsequent oral understandings should affect an employer's written obligations any differently. It is true that, where the terms of a CBA are ambiguous, a court may look to the conduct of the parties subsequent to the signing of the agreement in order to determine what the employer's obligations under the agreement are. *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993). State, however, is not arguing that the understanding assertedly arrived at between Ponticello and MacDougall ought to control in the face of ambiguities in the CBA. Rather, it is

arguing that the asserted understanding supersedes the written terms of the Agreement. In this district, Judge Joyner has held that, as a general matter, an oral agreement with a union cannot alter an employer's obligations to a third-party beneficiary fund. *Cent. Pa. Teamsters Health & Welfare Fund v. Scranton Bldg. Block Co.*, 882 F. Supp. 1542, 1544 (E.D. Pa 1995). That ruling is in accord with the prevailing case law. *See N.Y. State Teamsters Conference Pension & Retirement Fund v. UPS*, 382 F.3d 272, 280 (2d Cir. 2004) ("[O]therwise valid collection regulations promulgated by a multiemployer plan to effectuate contributions cannot be defeated by implied or unwritten agreements between the employers and unions."); *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 911 (7th Cir. 2000) ("Because pension funds are entitled to rely on the terms of a CBA, a fund's reliance upon those terms may not be thwarted by oral understandings between the employer and the union . . . ."); *Bakery & Confectionery Union and Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) "([A]n employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement."). This rule is consistent with Section 515's purpose of insulating benefit plans from disputes between local unions and employers, *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Trucks Serv. Inc.*, 870 F.2d 1148, 1152-53 (7th Cir. 1989) (en banc), in that it frees them from having "to monitor . . . the understandings that arise between the individual unions and employers," *Ralph's Grocery*, 118 F.3d at 1021.[7]

State cites one case in support of its contention that oral modifications can be enforced

---

[7] In *Abate v. Browning-Ferris Industries*, the Third Circuit held that oral modifications to written agreements to contribute to union benefit funds are invalid. 767 F.2d 52, 55 (3d Cir. 1985). That conclusion, however, was reached through the application of Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), not, as here, through the application of Section 515 of ERISA. *Id.*

against third party beneficiaries in this context. *Iron Workers Dist. Council Welfare & Pension Fund v. Butler Fence*, 919 F. Supp. 589 (N.D.N.Y. 1996). That case, however, is clearly distinguishable. While it is true that the court in *Butler Fence* allowed the defendant employer to argue that the CBA had been modified, it did so while specifically noting that "the oral modification . . . does not contradict [the] express terms of the" the CBA. *Id.* at 595. *Butler Fence*, then, is consistent with the position that informal modifications which contradict the clear language of the CBA are unenforceable against a third-party beneficiary. It therefore provides no support for State's theory.

I conclude therefore that, even if MacDougall both intended to modify Local 380's contract with State and had the authority to do so, State would still be obligated to make contributions to the Funds on the Great Valley job. Summary judgment is therefore appropriate on this issue as well.

## C. Damages

State contends that, even if it was required to make contributions to the Funds for the full period running from February 2004 to December 2004, the Funds' figure of $284, 251.59 does not accurately reflect what its obligations would be. It claims that Local 380's accountant, Daniel Quinn, mistakenly calculated State's obligations to the Funds based on all the wages earned by Local 380 members employed by State in 2004, whereas many of those laborers worked for multiple unions during the year, meaning that the Funds would only have been entitled to contributions on a portion of their wages. In support of this contention, State introduces both its accountant's affidavit and a record of wages earned by Local 380 members employed by State in 2004. In response, the Funds argue that, because ERISA imposes a duty on an employer to "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees," 29 U.S.C. § 1059 (a)(1), the burden with respect to damages shifts when an employer

fails to maintain adequate records. Citing what they describe as State's repeated failure to make accurate information available to Local 380's accountant, the Funds therefore maintain that ERISA entitles them to approximate the contributions they are owed.

This burden-shifting framework has been adopted by many courts. *See Composition Roofers Union Local No. 30 Welfare Trust Fund v. L.A. Kennedy Inc.*, No. Civ. A. 93-1558, 1996 WL 220975, at *6 (E.D. Pa. May 2, 1996) ("If an employer fails to maintain adequate records and fails to come forward with other evidence of covered work, then the employee benefit funds are entitled to approximate the contributions owed to them.") (citing *Combs v. King*, 764 F.2d 818, 826 (11th Cir. 1985)); *Cent. Pension Fund of the Int'l Union of Operating Engineer & Participating Employers v. Murphy's Tire, Inc.*, No. 97-CV-814, 1998 WL 865594, at *7-*8 (N.D.N.Y. Dec. 9, 1998) (same). However, even assuming that the Funds have established that State was delinquent in its record keeping, the Funds are still not entitled to summary judgment on damages under this burden-shifting framework. Courts which have adopted that framework have been reluctant to apply it at the summary judgment stage, holding that an employer's affidavit disputing the benefit funds' damage calculation is sufficient to avoid summary judgment. *L.A. Kennedy*, 1996 WL 220975 at *7; *Murphy's Tire*, 1998 WL 865594 at *8-*9. Here, State has provided more than affidavits to oppose the Funds' damage calculations. Therefore, the Funds are not entitled to summary judgment on the issue of damages.

## IV. Conclusion

The Funds are entitled to summary judgment with respect to whether State was obligated to make contributions at the contractual rates for all hours worked by members of Local 380 during 2004. First, by the clear terms of the Agreement, State was obligated to adhere to all of its terms at

least until September 5, 2004.  Second, State's attempted withdrawal from the CBA was ineffective because it failed to provide written notice to NECA, and, even if that fact were to be regarded as in dispute, summary judgment is still appropriate, because State is barred from arguing termination as a defense against the Funds.  Finally, State cannot enforce the alleged oral modification against the Funds because oral understandings between an employer and a union cannot be enforced against a third-party beneficiary when they contradict the written terms of the CBA.

However, the Funds are not entitled to summary judgment with respect to the damages figure they have submitted.  State has, through its affidavits and the employment records it has provided, created sufficient doubt as to the accuracy of the Funds' calculation to preclude summary judgment.

An order effectuating these rulings accompanies this opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 380 HEALTH & WELFARE TRUST FUND, PENSION FUND, ANNUITY FUND AND ADMINISTRATIVE FUND,<br><br>      Plaintiffs,<br><br> v.<br><br>STATE ELECTRIC,<br><br>      Defendant. | Civil Action<br><br>No. 04-2610 |

**ORDER**

  AND NOW, this 28th day of July, 2006, it is hereby ORDERED that:

(1) The motion for summary judgment of Plaintiffs (Docket # 32) is GRANTED with respect to Defendant's liability.

(2) The motion for summary judgment of Plaintiffs (Docket # 32) is DENIED with respect to damages.

                 __s/ Louis H. Pollak_____
                 Pollak, J.